United States District Court
Middle District of Florida
Jacksonville Division

**ST. AUGUSTINE–ST. JOHNS
COUNTY AIRPORT AUTHORITY,**

       *Plaintiff,*

  **v.**                                        **NO. 3:19-cv-573-34PDB**

**BOOMERANG, LLC,**

       *Defendant.*

---

## Report and Recommendation

St. Augustine–St. Johns County Airport Authority brought this action in state court[1] requesting a declaration and an injunction to resolve a dispute over whether Boomerang, LLC, must execute an operating agreement with minimum operating standards and minimum insurance-policy limits to continue flights from Northeast Florida Regional Airport to Marsh Harbour, Bahamas. Doc. 3.

Boomerang removed the case here, contending this Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Airport Authority's claims arise under the rules and regulations of the Federal Aviation Administration ("FAA") and the Airline Deregulation Act, Pub. L. No. 95-504, 92 Stat. 1705 (codified at 49 U.S.C. §§ 40101, *et seq*.). Doc. 1 at 2.

Three matters are before the Court.

---

[1]The Airport Authority brought this action in the Circuit Court, Seventh Judicial Circuit, in and for St. Johns County, Florida. Doc. 3 at 1.

First, before the Court is the threshold issue of whether the Court has subject-matter jurisdiction, raised sua sponte:

> Upon review of the Complaint and the Notice [of Removal], the Court is unable to readily discern whether Plaintiff's causes of action in fact "arise under the laws of the United States" as Defendant suggests in its Notice. Indeed, aside from alleging that its Minimum Operating Standards are "in accordance with the rules and regulations of the Federal Aviation Administration," Plaintiff's Complaint does not reference any federal statute or otherwise assert that its claims for relief arise from a particular federal statute. Accordingly, the Court finds that the allegations in the Complaint and in the Notice are insufficient to allow the Court to satisfy its obligation to assure that federal question jurisdiction exists over this action.

Doc. 13 at 3 (internal citations omitted). The parties have briefed the issue. Docs. 14, 22, 25. The Airport Authority contends the Court has no jurisdiction. Doc. 22. Boomerang disagrees. Docs. 14, 25.

Second, before the Court is Boomerang's motion to dismiss, Doc. 6, and the Airport Authority's response in opposition, Doc. 7. Boomerang argues dismissal is warranted for three reasons: (1) federal law preempts the Airport Authority's claims; (2) the complaint fails to state a claim on which relief may be granted because the Airport Authority failed to exhaust administrative remedies under a comprehensive administrative remedial scheme for resolving a dispute affecting a public airport; and (3) the Airport Authority failed to join a necessary party—the FAA. Doc. 6.

Third, before the Court is the Airport Authority's motion for rulings on subject-matter jurisdiction and the motion to dismiss, Doc. 33, and Boomerang's response in opposition, Doc. 34. To enable the parties to investigate obtaining discretionary declaratory relief from the FAA under the declaratory-judgment provision of the Administrative Procedures Act, 5 U.S.C. § 554(e), rather than continuing litigation, the Court deferred ruling on subject-matter jurisdiction and the motion to dismiss. Doc. 29. The Airport Authority now requests rulings because its informal discussions

with FAA representatives suggest the FAA would decline to provide declaratory relief. Doc. 33.

The Court vacated the deadlines in the case management and scheduling order pending a ruling on subject-matter jurisdiction and the motion to dismiss. Doc. 27. Should the case remain here, the parties are prepared to file a new case management report. At a telephone conference in April 2020, the parties agreed a controversy remains despite the slowdown in international air travel due to the global pandemic. Doc. 36.

## I.    Background

The Airport and Airway Improvement Act of 1982, 49 U.S.C. §§ 47101–47144, provides background for the matters before the Court.[2]

The Airport and Airway Improvement Act authorizes the FAA to provide grants to airports. 49 U.S.C. § 47104. The FAA makes the grants through the Airport Improvement Program. 49 U.S.C. §§ 47101(a)(11), 47107; *see* FEDERAL AVIATION ADMINISTRATION, *What is AIP?*, https://www.faa.gov/airports/aip/overview/ (last visited April 29, 2020).

To receive and maintain a grant, the Airport and Airway Improvement Act provides that an airport must make assurances, including that the airport will be available for public use on reasonable terms and without unjust discrimination and that each carrier using the airport will be subject to substantially comparable rules, regulations, and conditions applicable to all carriers similarly using the airport (except for differences based on reasonable classifications, like between tenants and non-tenants). 49 U.S.C. § 47107(a)(1)–(2); Doc. 6-5.

---

[2]The Airport and Airway Improvement Act of 1982 originally was codified elsewhere but in 1994 was repealed and recodified at 49 U.S.C. §§ 47101 *et seq.* without substantive change. *See* Pub. L. 103-272 (July 5, 1994).

3

To minimize the potential for violating an assurance, the FAA "highly recommends" that each grant recipient establish "reasonable minimum standards that are relevant to the proposed aeronautical activity with the goal of protecting the level and quality of services offered to the public." Doc. 7-1 at 1, 3 (FAA Advisory Circular 150/5190-7). The FAA will not approve a grant recipient's minimum standards but will review them upon a grant recipient's request and may advise the grant recipient on appropriateness. *Id.* at 1, 2, 4. If a grant recipient is contemplating denying an "on-airport aeronautical activity," the FAA encourages the grant recipient to contact a local or regional office for a reasonableness assessment. *Id.*

Regulations under the Airport and Airway Improvement Act establish a formal procedure for complaining about a grant recipient's noncompliance with a grant assurance. 14 C.F.R. §§ 13.3(d), 16.1. The regulations are referred to as "Part 16."

Under Part 16, "a person directly and substantially affected by any alleged noncompliance" with a grant assurance may file a complaint with the FAA, 14 C.F.R. § 16.23(a), after first making a good faith effort to informally resolve the matter with "the individuals or entities believed responsible for the noncompliance," *id.* § 16.21(a).[3]

If informal resolution fails, the complaint may proceed through pleadings, an investigation, an initial determination (with or without a corrective plan), a hearing before a hearing officer, an initial decision, an administrative appeal, and a final agency decision. *Id.* §§ 16.23–16.26, 16.29, 16.31, 16.109, 16.241. The parties are the

---

[3]An informal resolution can be accomplished by mediation, arbitration, use of a dispute resolution board, "or other form of third party assistance." 14 C.F.R. § 16.21(a); *see also* Doc. 6-4 at 75, 83 (FAA Airport Compliance Manual discussing informal resolution).

The FAA also may initiate its own investigation. 14 C.F.R. § 16.101. "[T]he typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the [f]ederal [g]overnment to terminate funds to the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981).

complainant, the respondent, and—from the hearing and beyond—the FAA. *Id.* §§ 16.3, 16.203(b)(1). From the hearing and beyond, the style must name the respondent as the appellant and the FAA as the agency. 14 C.F.R. § 16.203(b)(1). Upon a finding the respondent is in "noncompliance on all identified issues," the complainant's standing ends, and the complainant cannot administratively appeal. *Id.* §§ 16.109(g), 16.31(c). Before issuance of a final decision, the FAA and the respondent may resolve the matter through a consent order. *Id.* § 16.243(a).

After an unsuccessful administrative appeal, a person may judicially appeal a final FAA decision to a United States Court of Appeals. *Id.* §§ 16.245(g), 16.247(a); *see also* 49 U.S.C. § 46110(c) (giving courts of appeals jurisdiction over final FAA decision). A district court lacks jurisdiction over the appeal. *See Ass'n of Citizens to Protect & Preserve the Env't of the Oak Grove Cmty. v. FAA,* 287 F. App'x 764, 766–67 (11th Cir. 2008) (affirming district court's order dismissing appeal of final order of FAA for lack of subject-matter jurisdiction).

## II.   Complaint

In the complaint, the Airport Authority alleges these facts. For resolving the current matters, the parties consider the facts undisputed.

The Airport Authority owns and operates the Northeast Florida Regional Airport.[4] Doc. 3 ¶ 3. The airport is in an unincorporated area of St. Johns County,

---

[4]The Airport Authority is an independent special district created through charter enactment by Florida's legislature under Chapter 189, Florida Statutes. *See* St. Augustine–St. Johns County Airport Authority, Charter, 2002 Laws of Florida, Ch. 2002-347. The charter empowers the Airport Authority to "maintain[] and operate airport facilities, warehouses, hangars, repair facilities, seaplane bases, and all other facilities incident to the operation of airport facilities for both foreign and domestic air transportation, either by land planes or seaplanes, including multimodal transportation facilities which interconnect with the airport facility." *Id.*

Florida. Doc. 3 ¶ 4. Through its executive director, the Airport Authority operates and administers the airport. Doc. 3 ¶ 7.

The Airport Authority maintains a "Lease Policy" and "Minimum Commercial Aviation Operating Standards." Doc. 3 ¶ 8; Doc. 3-1. The minimum operating standards "are intended to be the threshold requirements for those desiring to provide commercial aeronautical or aviation[-]related services to the public" at the airport under FAA rules and regulations. Doc. 3 ¶ 10. The minimum operating standards also prescribe minimum insurance-policy limits. Doc. 3 ¶ 12. Other types of aeronautical activities must meet minimum operating standards that the executive director establishes on a case-by-case basis. Doc. 3 ¶ 11.

The Airport Authority's "Minimum Commercial Aviation Operating Standards" provide that all persons who want to conduct commercial aeronautical or aviation-related activities or services at the airport must execute an operating agreement or a composite lease/operating agreement specifying compliance with the minimum operating standards. Doc. 3 ¶ 9; Doc. 3-1 at 1.

Boomerang owns aircraft and wants to use the airport for taking off and landing the aircraft, selling tickets for flights, loading and unloading passengers and luggage, and conducting "other operations associated with a scheduled FAR Part 135 operator and on-demand FAR Part 135 operator." Doc. 3 ¶ 13. ("FAR Part 135" references aviation regulations at 14 C.F.R. Part 135, which provide operating requirements for commuter and on-demand operations and rules for persons onboard such aircraft.) Boomerang owns or operates a Pilatus aircraft with tail number N360DA and other aircraft associated with FAA-issued charter certificate OBGA623K. Doc. 3 ¶ 14.

On October 3, 2018, the *Jacksonville Business Journal* published an article stating that Boomerang would "soon begin offering individual tickets on direct flights to the Bahamas," would "offer up to nine seats on each flight from St. Augustine to

Marsh Harbo[u]r," and would "offer a morning and afternoon flight on Fridays, Saturdays and Sundays between Apr. 1 and Aug. 31 next year." Doc. 3 ¶ 15; Doc. 3-2 at 3. Boomerang announced its intention to fly scheduled "FAR Part 135" service in 2019 between St. Augustine and Marsh Harbour and advertised the service and the number of seats available on Facebook and other social media. Doc. 3 ¶ 15; Doc. 3-2 at 1.

On March 29, 2019, the Airport Authority's executive director sent Boomerang a letter (1) stating that the Airport Authority knew Boomerang intended to fly scheduled service between St. Augustine and Marsh Harbour and (2) informing Boomerang it had to execute an operating agreement before beginning scheduled service. Doc. 3 ¶ 16; Doc. 3-3.

On April 6, 2019, Boomerang's lawyer responded, asserting that Boomerang is an "FAA Part 135 certificated operator" operating on-demand service at the airport, not scheduled service. Doc. 3 ¶ 17; Doc. 3-4 at 1. He wrote, "As you are no doubt aware, there are many Part 135 Operators providing on-demand service in and out of [the airport]. Because [the airport] is a public use airport, Boomerang expects to be treated in the same manner as all of its competitors in the commercial marketplace for on-demand services at [the airport]." Doc. 3-4 at 1.

The Airport Authority has provided Boomerang an operating agreement, but Boomerang refuses to execute it. Doc. 3 ¶ 23. "[D]espite almost daily evidence to the contrary, including independent lease agreements entered into by the aircraft owners with the airport's fixed base operator, Atlantic Aviation," Boomerang has claimed that some or all aircraft associated with its charter certificate are not based at the airport. Doc. 3 ¶ 19. Boomerang contends it need not execute the operating agreement because its service is "on-demand"—not "scheduled"—, the airport is for public use, and Boomerang is not "based" at the airport. Doc. 3 ¶¶ 31–33.

FlightAware—a website for tracking aircraft flights—reports that Boomerang has flown the aircraft with tail wing number N360DA from St. Augustine and Marsh Harbour at least four times between March 30 and April 7, 2019. Doc. 3 ¶ 20; Doc. 3-5 at 1 (flight activity history). Those flights have occurred without an operating agreement in place. Doc. 3 ¶ 39. Boomerang intends to continue flying scheduled service between the airport and Marsh Harbour without executing an operating agreement. Doc. 3 ¶ 40.

The Airport Authority facilitates United States Customs and Border Protection Services so aircraft can fly directly to and from foreign countries. Doc. 3 ¶ 22. Those services are subject to a user fee. Doc. 3 ¶ 22. Because Boomerang has refused to execute an operating agreement, those fees are not being and will not be collected. Doc. 3 ¶ 24.

Specifying no common law or statutory cause of action in the complaint, the Airport Authority seeks two forms of relief and attorney's fees and costs. First, the Airport Authority seeks "a judgment declaring that [Boomerang] must execute an operating agreement before flying on-demand and scheduled service between St. Augustine … and Marsh Harbour … or any other destination" and "must meet [the] Minimum Operating Standards." Doc. 3 at 6. Second, the Airport Authority seeks "a judgment permanently enjoining [Boomerang] from flying on-demand and scheduled service between St. Augustine … and Marsh Harbour … or any other on demand or scheduled service from St. Augustine," and from "violating [the] Minimum Operating Standards." Doc. 3 at 7.

### III.   Law and Analysis

### A.   *Subject-Matter Jurisdiction*

*1.   Law*

A federal court must inquire into subject-matter jurisdiction sua sponte whenever it may be lacking. *Application of Furstenberg Fin. SAS v. Litai Assets LLC*, 877 F.3d 1031, 1033 (11th Cir. 2017).

Under 28 U.S.C. § 1441(a)—the federal removal statute—"any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

Under 28 U.S.C. § 1447(c)—the federal remand statute—"[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."[5] *See also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). "A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court." *Id.* "The State court may thereupon proceed with such case." *Id.*

Here, as its basis for removal, Boomerang relies only on federal-question jurisdiction under 28 U.S.C. § 1331. *See* Doc. 1. Under that statute, "The district courts shall have original jurisdiction of all civil actions **arising under the**

---

[5]"An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c).

Here, the Airport Authority does not ask the Court to require Boomerang to pay the costs and expenses the Airport Authority incurred as a result of the removal. *See generally* Doc. 22.

**Constitution, laws, or treaties of the United States**." 28 U.S.C. § 1331 (emphasis added).

Since the enactment of § 1331, the phrase "arising under the Constitution, laws, or treaties of the United States" has "resisted all attempts to frame a single, precise definition for determining which cases fall within, and which cases fall outside, the original jurisdiction of the district courts," especially when considered with the federal removal statute (§ 1441). *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 8 (1983) (internal citation omitted).

But "[o]ne powerful doctrine has emerged." *Id.* at 9. Under the "well-pleaded complaint" rule, a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case "arises under" federal law. *Id.* at 10. A defendant may not remove a case to federal court based on a federal defense, including the defense of preemption, even if the defense is anticipated in the complaint and both parties admit the defense is the only question truly at issue. *Id.* at 14.

Here, although the complaint does not expressly say so, the Airport Authority seeks declaratory and injunctive relief under Florida's declaratory-judgment law.[6] *See generally* Doc. 3. Under that law,

> Any person claiming to be interested or who may be in doubt about his or her rights under a deed, will, contract, or other article, memorandum, or instrument in writing or whose rights, status, or other equitable or legal relations are affected by a statute, or any regulation made under statutory authority, or by municipal ordinance, contract, deed, will, franchise, or other article, memorandum, or instrument in writing may have determined any question of construction or validity arising under such statute, regulation, municipal ordinance, contract, deed, will, franchise, or other article, memorandum, or instrument in writing, or

---

[6]At a hearing on subject-matter jurisdiction and the motion to dismiss—discussed later—, the Airport Authority's counsel confirmed the Airport Authority seeks to proceed under Florida's declaratory-judgment law.

any part thereof, and obtain a declaration of rights, status, or other equitable or legal relations thereunder.

Fla. Stat. § 86.021.

The Florida legislature (1) has declared that Florida's declaratory-judgment law is "substantive and remedial," (2) has explained that the law is designed "to settle and to afford relief from insecurity and uncertainty with respect to rights, status, and other equitable or legal relations," and (3) has directed that the law be "liberally administered and construed." Fla. Stat. § 86.101. The law grants state courts jurisdiction to "declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed." Fla. Stat. § 86.011. The law permits a court's declaration to be "either affirmative or negative in form and effect." *Id.* The law provides that "such declaration has the force and effect of a final judgment." *Id.* The law allows a court to enter a declaratory judgment on the existence or nonexistence of "any immunity, power, privilege, or right" or of "any fact upon which the existence or nonexistence of such immunity, power, privilege, or right does or may depend, whether such immunity, power, privilege, or right now exists or will arise in the future." *Id.* § 86.011(1), (2). And the law allows anyone seeking a declaratory judgment to also demand "additional, alternative, coercive, subsequent, or supplemental relief in the same action." *Id.* § 86.011(2).

The federal counterpart—the Declaratory Judgment Act—provides, "In a case of actual controversy within its jurisdiction," with exceptions inapplicable here, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Declaratory Judgment Act also provides, "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.* § 2202.

11

The Declaratory Judgment Act does not confer jurisdiction on a federal court. *Borden v. Katzman*, 881 F.2d 1035, 1037 (11th Cir. 1989). Rather, an action under the Declaratory Judgment Act must state an "independent source" of jurisdiction. *Id.*

If there is an underlying ground for jurisdiction, the Declaratory Judgment Act permits a plaintiff to precipitate an action that otherwise would have to wait for the defendant to bring a coercive claim. *Gulf States Paper Corp. v. Ingram*, 811 F.2d 1464, 1467 (11th Cir. 1987), *abrogated on other grounds by King v. St. Vincent's Hosp.*, 502 U.S. 215 (1991). A coercive claim is a private right of action authorizing the party to seek an immediately enforceable remedy, like monetary damages or an injunction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).

"A district court has subject matter jurisdiction over a declaratory judgment action if the plaintiff's well-pleaded complaint alleges that the defendant could institute a coercive action arising under federal law." *Household Bank v. JFS Grp.*, 320 F.3d 1249, 1258 (11th Cir. 2003). For example, because a patent owner can assert a coercive federal claim against a patent infringer, the district court "necessarily" has subject-matter jurisdiction over a declaratory judgment action filed by an alleged infringer who challenges the validity of a patent. *Id.*; *see also, e.g., Columbia Gas Trans. Corp. v. Drain*, 237 F.3d 366, 370–71 (4th Cir. 2001) (district court has jurisdiction over declaratory-judgment action where plaintiff gas company seeks declaration that company's use of easement is not unconstitutional taking as "reverse" of coercive claim defendant has against plaintiff under 42 U.S.C. § 1983).

In *Skelly Oil*, the Supreme Court held a plaintiff's claim under the Declaratory Judgment Act must present a federal question "unaided" by anything alleged in anticipation of avoidance of a defense the defendant may raise. 339 U.S. at 672. *Skelly Oil* "stands for the proposition that if, but for the availability of the federal declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking." *Franchise Tax Bd.*, 463 U.S. at 16.

In *Franchise Tax Board*, the Supreme Court, examining the federal removal statute (§ 1441(a)) and the federal remand statute (§ 1447(c)), held that a federal court has no federal-question jurisdiction—and acquires no federal-question jurisdiction on removal—where the plaintiff presents a federal question in a complaint for a state declaratory judgment but where, had the plaintiff sought a federal declaratory judgment, *Skelly Oil* would bar federal jurisdiction. 463 U.S. at 19.

Where a defendant removes an action for a state declaratory judgment, the question is whether the federal court would have jurisdiction over the plaintiff's declaratory-judgment claim had it been brought under the federal Declaratory Judgment Act. *Id.* at 19. To decide whether a federal court would have jurisdiction over a state declaratory-judgment claim had the plaintiff brought the claim under the federal Declaratory Judgment Act, the court looks at the face of the declaratory-judgment complaint and determines whether the claim anticipated by the declaratory-judgment plaintiff—the coercive claim—arises under federal law. *Id.* at 19–20; *see Gulf States*, 811 F.2d at 1467 ("[T]he declaratory judgment device allows a party to bootstrap its way into federal court by bringing a federal suit that corresponds to one the opposing party might have brought.") (internal quotations omitted).

A claim arises under federal law in two ways. *Gunn v. Minton*, 568 U.S. 251, 257 (2013). First, "[m]ost directly, a case arises under federal law when federal law creates the cause of action asserted." *Id.* "As a rule of inclusion, this 'creation' test admits of only extremely rare exceptions, and accounts for the vast bulk of suits that arise under federal law."[7] *Id.* (internal citation omitted).

---

[7]Less directly, where a "federal statute completely preempts a state-law cause of action [for example, certain provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*,] a claim within the scope of that cause of action, even

Second, "even where a claim finds its origins in state rather than federal law," the Supreme Court has identified a "special and small category of cases in which arising under jurisdiction still lies." *Id.* (internal quotation marks and quoted authority omitted). The category, which dates back "nearly 100 years" in Supreme Court precedent, is rooted in "the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).

---

if pleaded in terms of state law, is in reality based on federal law." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003).

"Complete preemption functions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court." *Blab T.V. of Mobile, Inc. v. Comcast Cable Commc'ns, Inc.*, 182 F.3d 851, 855 (11th Cir. 1999). "[A] federal law may substantively displace state law under ordinary preemption but lack the extraordinary force to create federal removal jurisdiction under the doctrine of complete preemption." *Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1353 (11th Cir. 2003).

Boomerang makes no argument that its preemption defense in its motion to dismiss based on the Airline Deregulation Act provides a basis for federal jurisdiction under the complete preemption doctrine. At the hearing on subject-matter jurisdiction and the motion to dismiss—discussed later—, Boomerang's counsel observed preemption could be a basis for jurisdiction but did not elaborate.

All courts that have addressed whether the Airline Deregulation Act provides a basis for federal jurisdiction under the complete preemption doctrine have held no, emphasizing dictum to that effect in *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 232 (1995), and reasoning that, in contrast with the Employee Retirement Income Security Act of 1974, the Airline Deregulation Act contains no provision suggesting Congress intended federal courts to have exclusive jurisdiction over a preemption defense to a state-law claim. *See, e.g., Wayne v. DHL Worldwide Exp.*, 294 F.3d 1179, 1184 (9th Cir. 2002); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 925–26 (5th Cir. 1997); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1253 (6th Cir. 1996); *accord Irabor v. Lufthansa Airlines*, 427 F. Supp. 3d 222, 233–34 (D. Mass. 2019); *Puterbaugh v. AirTran Airways*, 494 F. Supp. 2d 597, 602–03 (S.D. Ohio 2003) (citing additional cases). The dictum and reasoning are persuasive, as is apparent from the consistent decisions on the issue. Complete preemption provides no basis for subject-matter jurisdiction here.

The Supreme Court has observed that in "outlining the contours of this slim category," it does not "paint on a blank canvas," but the Court also has lamented, "[u]nfortunately, the canvas looks like one that Jackson Pollock got to first." *Gunn*, 568 U.S. at 258.

In *Gunn*, the Supreme Court condensed the cases in this category into one principle: "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* "Where all four of these requirements are met," the Court explained, "jurisdiction is proper because there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum, which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id.* (internal quotation marks and quoted authority omitted).

Regarding the third requirement—substantiality—, "it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will always be true[.]" *Id.* at 260. Substantiality "looks instead to the importance of the issue to the federal system as a whole." *Id.* An issue is more likely to involve a substantial federal question if it is a pure question of law, if the issue "will control many other cases," or if the federal government "has a strong interest in litigating in a federal forum." *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 842 (11th Cir. 2013) (comparing cases and explaining, "[T]he government interest in any particular fact-bound question of patent infringement is less significant than the government interest in a question of law that will impact the ability of the government to raise revenue in a number of future cases.").

As an example of a case falling in this narrow category, the Court in *Gunn* pointed to *Grable*. *Gunn*, 568 U.S. at 260–61. In *Grable*, five years after the Internal Revenue Service seized property from the plaintiff and sold it to satisfy the plaintiff's tax delinquency, the plaintiff filed a state-quiet-title action against the third-party

15

purchaser of the property, alleging the Internal Revenue Service had violated federally imposed noticed requirements. 545 U.S. at 310–11. The Court focused "not on the interests of the litigants themselves, but rather on the broader significance of the notice question" for the federal government, emphasizing the federal government's "strong interest" in recovering delinquent taxes through seizure and sale of property, which requires clear notice terms to buyers so buyers may feel comfortable they will acquire good title. *Gunn*, 568 U.S. at 260 (citing *Grable*, 545 U.S. at 315). According to the Court, the federal government's "direct interest in the availability of a federal forum to vindicate its own administrative action" made the question "an important issue of federal law that sensibly belong[ed] in a federal court." *Grable*, 568 U.S. at 315.

The Supreme Court has not discussed the narrow category in the context of a declaratory-judgment action. Without analysis, in discussing the four requirements, the Fourth Circuit has considered the declaratory-judgment complaint, *see Pressl v. Appalachian Power Co.*, 842 F.3d 299, 303–04 (4th Cir. 2016), while the Second Circuit has considered the potential coercive claims, *see NASDAQ OMX Grp., Inc. v. UBS Sec., LLC,* 770 F.3d 1010, 1018–20 (2d Cir. 2014).

2.   *Arguments*

a.   Boomerang's Arguments

Boomerang contends the Court has jurisdiction over the Airport Authority's request for declaratory relief under the federal-question statute (§ 1331) because that claim arises under federal law.[8] Doc. 14 at 8–25. Boomerang contends the Court has supplemental jurisdiction over the Airport Authority's claim for injunctive relief

---

[8]Citations to Boomerang's brief on jurisdiction are to page numbers designated by Boomerang and not to the page numbers "stamped" through CM/ECF.

under the supplemental-jurisdiction statute (28 U.S.C. § 1367) because that claim is "entirely derivative of the count for declaratory relief." Doc. 14 at 3 n.1.

Boomerang contends the dispute does not concern the Airport Authority's police power or the Airport Authority's right as a property owner to exclude Boomerang from the airport, observing that the complaint seeks no declaration—and there is no uncertainty—about either. Doc. 14 at 8. Boomerang argues the Airport Authority is concerned about only a possible consequence of exercising police power: that Boomerang will complain to the FAA that the Airport Authority is violating its grant assurance to refrain from economic discrimination. Doc. 14 at 2, 9, 11. Boomerang points to its counsel's April 6, 2019, letter to the Airport Authority in which counsel stated, "As you are no doubt aware, there are many Part 135 Operators providing on-demand service in and out of [the airport]. Because [the airport] is a public use airport, Boomerang expects to be treated in the same manner as all of its competitors in the commercial marketplace for on-demand services at [the airport]." Doc. 14 at 10 (quoting Doc. 3-4). Boomerang asserts that statement "approximately translates" to:

> The contract [the Airport Authority is asking Boomerang to sign] would impose use restrictions and economic burdens on [Boomerang] that are greater than those of its identically situated competitors. Your proposed conduct would violate the grant assurances you made as a public use airport …. [Boomerang] will assert its federal rights with the FAA which are known to you. As a consequence of violating your grant assurances, your federal operating subsidies may be suspended by the FAA.

Doc. 14 at 11. Boomerang also emphasizes this paragraph in the complaint: "A declaration by the Court is necessary and appropriate to clarify and establish what rights, if any, Defendant has to fly on-demand and scheduled service between St. Augustine … and Marsh Harbour … or any other destination without first executing an operating agreement." Doc. 14 at 3, 9, 12 (citing Doc. 3 ¶ 36). Boomerang contends the Airport Authority "seeks a declaratory statement about Boomerang's federal rights, not [the Airport Authority's] own." Doc. 14 at 3.

17

Defining the dispute that way, Boomerang argues the Court must "reconstitute the complaint into the hypothetical claim that would be brought by the party seeking to coercively vindicate the rights in the dispute (the so-called 'coercive action')" and then decide whether that "coercive action" arises under federal law. Doc. 14 at 12. Boomerang contends the Airport Authority has no potential coercive action against Boomerang because the parties have no contractual relationship, the Airport Authority has not denied Boomerang access to or use of the airport, and there is no allegation that Boomerang is trespassing or otherwise unlawfully conducting operations at the airport. Doc. 14 at 16.

Boomerang asserts it alone has a potential coercive action; specifically, a complaint to the FAA under Part 16 that the Airport Authority has subjected it to economic discrimination in violation of its grant assurances to the FAA if the Airport Authority acts against Boomerang.[9] Doc. 14 at 16–18. Boomerang argues, "Because [the Airport Authority] has no state … cause of action, [the Airport Authority] attempted to enter state court riding a *procedural* remedy—a declaratory action— asserting [the Airport Authority's] own anticipated defenses to [Boomerang's] federal cause of action and *substantive* coercive claims." Doc. 14 at 18. Citing Part 16, Boomerang states, "It is this federal cause of action, expressly arising under federal statute, that is the underlying coercive action in the dispute." Doc. 14 at 18.

Boomerang alternatively argues that even if Boomerang has no federal cause of action, the court would have subject-matter jurisdiction under the second, narrow category identified in *Gunn*. Doc. 14 at 19. Boomerang contends the first two requirements are established because its "rights under [the Airport and Airway Improvement Act] … are necessarily raised an[d] actually disputed." Doc. 14 at 20. Boomerang contends the third and fourth requirements are established because of

---

[9]Boomerang also cites Part 13, which provides a procedure for any person to report a violation to the FAA, Doc. 14 at 17. *See* 14 C.F.R. § 13.1. Following that procedure can serve as an attempt to informally resolve a complaint, as required before proceeding with a complaint under Part 16. Doc. 6-4 at 83.

federal preemption, observing the Airline Deregulation Act preempts a state law "related to a price, route, or service of an air carrier," and "in the arena of aviation regulation, federal concerns are preeminent." Doc. 14 at 21–25.

For this argument, Boomerang relies heavily on *Arapahoe County Public Airport Authority v. Federal Aviation Administration*, 242 F.3d 1213 (10th Cir. 2001). Doc. 14 at 26–28.

In *Arapahoe*, an airport authority banned scheduled service and thereafter asked the FAA for guidance on whether it could legally prohibit scheduled service. 242 F.3d at 1216. Despite the ban, an airline initiated scheduled service. *Id.* at 1216–17. The airport authority sought and obtained from a state court a temporary and then a permanent injunction to prevent the airline from offering scheduled service. *Id.* at 1217. The airline appealed to the state supreme court. *Id.* Meanwhile, complaints before the FAA proceeded through the Part 16 process. *Id.* The state supreme court upheld the permanent injunction, holding federal law had no preemptive effect and the ban did not violate the airport authority's grant assurance of non-discrimination. *Id.* Afterward, through the Part 16 process, the FAA decided the opposite: the ban violated the airport authority's grant assurance of non-discrimination. *Id.* The airport authority appealed the FAA's decision to a federal court of appeals. *Id.* That court affirmed the FAA's decision, holding the state injunction had no preclusive effect in the Part 16 proceedings because the state court focused on the airline's conduct and addressed federal preemption and the airport authority's obligations in the narrow context of rejecting the airline's defenses; the state court's conclusions on the airport authority's obligations lacked the depth and breadth of analysis the FAA gave them; the state court was divided; the FAA was not a party to—nor in privity with—any party to, the state-court proceedings; and the strong policy of federal supremacy in the field of aviation prevailed over full faith and credit principles. *Id.* at 1218–20.

According to Boomerang, *Arapahoe* supports satisfaction of the third and fourth requirements. Doc. 14 at 28.

b.   <u>Airport Authority's Arguments</u>

The Airport Authority responds it seeks nothing from the FAA through this action, it has no uncertainty about its legal rights and obligations relating to the FAA, and it contemplates no denial of "on-airport activity" that would require the FAA's interjection as the final authority. Doc. 22 at 2. The Airport Authority explains that, by seeking to require Boomerang to execute an operating agreement, it seeks only to do what the FAA leaves within the Airport Authority's "purview"—to enforce and carry out reasonable minimum standards for the "proposed aeronautical activity" to protect the "level and quality of services offered to the public." Doc. 22 at 2.

The Airport Authority explains it seeks declaratory relief regarding its "inherent police or proprietary powers to enforce minimum operating standards by having Boomerang execute an operating agreement" and contends "[t]his cause of action does not invoke federal jurisdiction, nor does it involve a federal question." Doc. 22 at 4–5. The Airport Authority admits it is a public use airport and must provide the airport on reasonable terms and without unjust discrimination and asserts it simply is trying to subject Boomerang to the same standards as other similarly situated carriers and avoid accusations the Airport Authority is favoring Boomerang. Doc. 22 at 3–4.

The Airport Authority argues the Court should ask whether, absent the availability of declaratory relief, an action by Boomerang could have been brought in federal court. Doc. 22 at 5. "No," the Airport Authority answers, because Boomerang first would have to exhaust administrative remedies, and any federal argument is at most a possible defense to the Airport Authority's non-federal effort to enforce its proprietary rights (though the Airport Authority knows of no such defense). Doc. 22 at 5–6.

Addressing Boomerang's alternative argument, the Airport Authority argues the narrow category of federal-question jurisdiction identified in *Gunn* is inapplicable because none of the four requirements are satisfied, contending the complaint is "devoid of any federal issue necessarily raised," the complaint is "devoid of any federal issue being actually disputed," the complaint is "devoid of any federal issue let alone a substantial federal issue," and the complaint is incapable of "resolution in federal court without disrupting the federal-state balance approved by Congress." Doc. 22 at 7. The Airport Authority observes federal law imposes no limit on a state political subdivision's ability to carry out its proprietary powers and rights. Doc. 22 at 7.

c.   <u>Boomerang's Reply</u>

Boomerang replies that the Airport Authority's response departs from the allegations of the complaint and tries to "reconstitute" the dispute as one involving a challenge to police power. Doc. 25 at 3. Boomerang contends the complaint "does not establish even a scintilla of a dispute regarding the inherent police power of the [airport authority] or its ability to condition use of the airport upon the execution of an agreement," adding that Boomerang does not contest the Airport Authority's power to establish conditions on use of the airport. Doc. 25 at 4.

Boomerang repeats that the complaint asks for a declaration of Boomerang's rights to operate at the airport, not the Airport Authority's rights. Doc. 25 at 4–5. Boomerang contends the Airport Authority has failed "to identify any coercive relief of its own" and rejects the Airport Authority's description of its claims, arguing, "The exercise of police power is not a 'cause of action.' A governmental entity's exercise of police power cannot be assigned to the judicial branch so as to make its exercise a 'coercive action' for purposes of jurisdictional analysis. A governmental entity does not institute a judicial proceeding to conduct the exercise of its inherent police power. It simply acts." Doc. 25 at 5–6. Boomerang presses that the dispute between the parties is "entirely about [the Airport Authority's] compliance with Federal Grant Assurances." Doc. 25 at 3.

For its alternative argument, Boomerang contends jurisdiction exists "for the same reasons federal question jurisdiction existed in *Arapahoe*[.]" Doc. 25 at 7.

Boomerang expresses fear of a "catastrophic sequel" to *Arapahoe*. Doc. 25 at 2. Boomerang provides a white paper from an industry association, the National Air Transportation Association, titled "Guide to Minimum Standards for Airport Sponsors and Aeronautical Businesses" to its reply, Doc. 25-2, suggesting the paper is a "well written explanation that the Court may find helpful," Doc. 25 at 7.[10]

3.   *Hearing*

On January 22, 2020, the undersigned conducted a hearing to hear arguments on subject-matter jurisdiction and the motion to dismiss.[11]

The Airport Authority explained that, other than obtaining an FAA employee's informal letter in 2018 stating operators should have minimum operating standards in place, the Airport Authority has sought no FAA guidance on the dispute with Boomerang. The Airport Authority reiterated that it filed the complaint to enable the state court to construe the Airport Authority's minimum operating standards and require Boomerang to sign an operating agreement.

The undersigned directed the parties to confer on whether this action should be stayed to pursue relief from the FAA under the declaratory-judgment provision of the Administrative Procedures Act, 5 U.S.C. § 554(e), in lieu of continued litigation. That law provides, "The agency, with like effect as in the case of other orders, and its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e); *see, e.g., Aviators for Safe & Fairer Regulation, Inc. v.*

---

[10]The paper includes much of the same information in earlier exhibits about grant assurances and suggested guidelines for minimum operating standards. *See* Doc. 25-2.

[11]Neither party has ordered a transcript of the hearing. Either party may order a transcript by contacting the undersigned's courtroom deputy.

*FAA*, 221 F.3d 222, 231 (1st Cir. 2000) ("With respect to the [duty-to-report scenario], [the plaintiff] is free to seek a formal declaratory ruling from the FAA and to present its policy arguments and evidence to the agency. … While the agency has discretion to refuse such a ruling, that refusal is reviewable for abuse of discretion … and we think that a refusal to tell [the plaintiff] in advance whether the scenario constitutes 'rest' would require a lot of explaining."). The undersigned referenced this alternative to avoid the "cautionary tale" of *Arapahoe*—a court's action could be rendered meaningless if the parties later proceed through Part 16 based on an administrative complaint filed by Boomerang and the FAA issues a contrary ruling. Meanwhile, the Court deferred ruling on the motion to dismiss until the parties indicated how they wished to proceed. Doc. 29.

The Airport Authority later filed its motion for a ruling on subject-matter jurisdiction and the motion to dismiss. Doc. 33. The Airport Authority explained it had contacted FAA representatives, and the FAA representatives conveyed that the FAA "would most likely decline to issue a declaratory order under [§ 554] on this matter." Doc. 33 at 2. The Airport Authority did not elaborate on why the FAA would most likely decline to issue a declaratory order. With no plan to request declaratory relief from the FAA, the Airport Authority asked the Court to rule on the pending matters. Doc. 33 at 2.

Boomerang complains the Airport Authority did not advise Boomerang of the Airport Authority's contact with the FAA representatives or decision to file its motion for a ruling until hours before the deadline to notify the Court of how the parties wished to proceed. Doc. 34 at 1 n.1. Boomerang wants the stay to remain in place pending exhaustion of administrative remedies with the FAA. Doc. 34 at 2. Boomerang states that, through the motion to dismiss, Boomerang has been arguing that an administrative complaint by the Airport Authority against Boomerang through a Part 13 informal complaint is the proper procedure for resolving the

dispute. Doc. 34 at 3. Boomerang adds in a footnote that any response by Boomerang would invoke Part 16 procedures. Doc. 34 at 3 n.3.

Citing *Arapahoe*, Boomerang contends that this Court's ruling will have no binding effect and argues the Airport Authority's unwillingness to go through the FAA "is inconsiderate to the other stakeholders in this litigation" and contrary to Federal Rule of Civil Procedure 1, which provides that the parties should secure a just and inexpensive determination of every action. Doc. 34 at 4.

Boomerang contends that the Court has subject-matter jurisdiction to grant the motion to dismiss and dismiss the case without prejudice for failure to exhaust administrative remedies, which would not prejudice the Airport Authority. Doc. 34 at 7. (The motion to dismiss seeks dismissal with prejudice. Doc. 6 at 20.)

*4.    Analysis*

Applying the principles in *Franchise Tax Board*, *Skelly Oil*, and *Gunn*, and considering only the face of the complaint, the Court lacks subject-matter jurisdiction.

The "coercive claim" Boomerang identifies is beyond what the face of the complaint fairly anticipates: Boomerang's hypothetical appeal to a federal court of appeals of the FAA's hypothetical adverse final decision on Boomerang's hypothetical Part 16 administrative complaint about the Airport Authority's hypothetical violation of the Airport Authority's grant assurance of nondiscrimination.[12] The complaint merely asks the state court to construe the Airport Authority's "Minimum

_____

[12]*See* Doc. 14 at 3 ("Airport knows that Boomerang has a federal cause of action to enforce its federal right to operate free from economic discrimination. 14 C.F.R. § 16.247 and 49 U.S.C. [§] 46110." (internal capitalization and italics omitted)), Doc. 14 at 16 ("Boomerang possesses a coercive action that is created by federal statute. That coercive action may have a condition precedent—the exhaustion of administrative remedies with the FAA—but [it] concludes in the federal judicial system by a statutory grant of subject matter jurisdiction."), and Doc. 14 at 18 ("It is this federal cause of action [citing Part 16], expressly arising under federal statute, that is the underlying coercive action in the dispute.").

Commercial Aviation Operating Standards" and decide whether, considering Boomerang's operations at the airport, the Airport Authority may require Boomerang to execute an operating agreement and meet the minimum operating standards.[13]

To support its argument that the Airport Authority sues in anticipation of Boomerang's federal cause of action, Boomerang contends the "exercise of police power" is not a cause of action under Florida law. Doc. 25 at 6. That contention overlooks that Florida's declaratory-judgment law allows the Airport Authority to obtain a judgment construing the "Minimum Commercial Aviation Operating Standards." *See* Fla. Stat. § 86.021. Moreover, if the Airport Authority fails to state a claim upon which relief may be granted, the failure means that the state court should dismiss the claim, not that the Airport Authority is trying to circumvent federal-court jurisdiction.

Even if the face of the complaint fairly anticipates the federal cause of action Boomerang identifies, Boomerang provides no authority, and the undersigned could find none, for the proposition that either a non-final hypothetical administrative complaint or a hypothetical judicial appeal of a hypothetical final agency decision is the type of coercive claim a federal court should consider to determine federal-question jurisdiction. Indeed, courts have concluded otherwise. *See Merced Irrigation Dist. v. Cty. of Mariposa*, 941 F. Supp. 2d 1237, 1266 (E.D. Cal. 2013) (explaining county had no ripened administrative claim to challenge federal agency decision because county had not even started administrative proceedings, let alone pursued

---

[13]Boomerang contends the Airport Authority's counsel admitted at the hearing the Airport Authority "seeks to resolve its uncertainty over the consequences it would suffer should it deny Boomerang's access to a public use airport." Doc. 34 at 2 (alterations omitted). The undersigned discerns no such admission from what the Airport Authority's counsel stated. In response to a direct question, the Airport Authority's counsel stated the complaint asks the Court to construe the minimum operating standards. Later, the undersigned observed that the Airport Authority anticipated Boomerang filing a complaint with the FAA if the Airport Authority denies Boomerang access, and the Airport Authority's counsel stated "yes," adding any judicial review of an FAA decision would involve only the appealing party versus the FAA.

them to final agency decision, and observing county presented no authority for proposition that non-final hypothetical agency claim not currently subject to judicial review is type of coercive action that court may consider to determine federal-question jurisdiction); *Shore Bank v. Harvard*, 934 F. Supp. 2d 827, 841–42 (E.D. Va. 2013) (holding judicial appeal of final agency decision is not claim arising under federal law that declaratory-judgment defendant could bring against declaratory-judgment plaintiff and therefore cannot support federal-court jurisdiction, and explaining potential judicial appeal is "largely speculative" and not clearly cognizable based on factual allegations in complaint showing no substantial controversy of sufficient immediacy and reality).

Moreover, with respect to a hypothetical judicial appeal of a hypothetical final decision by the FAA—the "coercive" claim Boomerang identifies would be not by Boomerang against the Airport Authority, but by Boomerang against the FAA, with the Airport Authority not necessarily a party.[14] *See Collin Cty., Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN),* 915 F.2d 167, 171 (5th Cir. 1990) ("Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action."); *Shore Bank*, 934 F. Supp. 2d at 842 (judicial appeal of final agency action is not reverse of declaratory-judgment plaintiff's claim); *cf. Arapahoe*, 242 F.3d at 1216–17 (naming airport authority as petitioner and FAA as respondent in airport authority's judicial appeal of FAA's adverse final decision). Even if the Airport Authority would be a party to that claim, this Court still would lack subject-matter jurisdiction because courts of appeals have exclusive jurisdiction over such a claim. *See* 49 U.S.C. § 46110; *Ass'n of Citizens*, 287 F. App'x

---

[14]At the hearing on subject-matter jurisdiction and the motion to dismiss, Boomerang's counsel suggested Boomerang could bring other claims against the Airport Authority if Boomerang was harmed and mentioned without elaboration a claim for discrimination. Because Boomerang provides no argument or analysis on this suggestion, the Court need not consider it further.

at 766–67. If this Court lacks jurisdiction over Boomerang's potential federal coercive claim, it lacks jurisdiction over the Airport Authority's declaratory-judgment action anticipating that claim. *See Merced*, 941 F. Supp. 2d at 1265–66 (holding district court lacks subject-matter jurisdiction over declaratory-judgment action anticipating hypothetical challenge to final agency action because courts of appeals have exclusive jurisdiction over such challenge).

Boomerang's argument that federal-question jurisdiction exists here for the same reason federal-question jurisdiction exists in *Arapahoe*, Doc. 25 at 7, fails. There, unlike here, the court of appeals undertook judicial review of a final FAA decision. *See Arapahoe*, 242 F.3d at 1216, 1217.

Contrary to Boomerang's alternative argument, this case does not fall under the narrow category of federal-question jurisdiction identified in *Gunn*—where, through a state-law claim, a federal question is necessarily raised, actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance approved by Congress. As a threshold problem with Boomerang's argument, Boomerang points to no state-law claim, instead referencing only its asserted federal coercive action. *See* Doc. 14 at 19 ("Boomerang's coercive action satisfies the criteria of *Gunn v. Minton*"); *Gunn*, 568 U.S. at 257 (explaining narrow category involves federal-question jurisdiction over "state law claim"). Moreover, whether considering the Airport Authority's state-law declaratory-judgment claim or Boomerang's asserted coercive federal claim for relief, Boomerang cannot satisfy at least one of the four requirements—the presence of a substantial federal question.[15] Boomerang fails to articulate any question of law important to the federal system as a whole that will control many other cases, and the complaint describes a fact-bound dispute involving the Airport Authority's own "Minimum Commercial Aviation Operating Standards" and Boomerang's own advertised and actual services from St.

_____

[15]Boomerang likely cannot satisfy other requirements. In the interest of judicial economy, analysis of these are omitted.

Augustine to Marsh Harbour or other destinations. *See Washington Consulting Grp., Inc. v. Raytheon Tech. Servs. Co., LLC*, 760 F. Supp. 2d 94, 101–02 (D.C. 2011) (holding the federal court had no subject-matter jurisdiction over state-law claims implicating FAA procurement law and describing cases involving state law claims that implicate federal aviation law but do not require context-free inquiry into meaning of federal law).

Because the Court lacks subject-matter jurisdiction, remanding the case to state court without addressing the motion to dismiss is warranted.[16]

**B.    *Motion to Dismiss***

In case the recommendation on subject-matter jurisdiction is not adopted, the undersigned also addresses Boomerang's arguments for dismissal: preemption, failure to exhaust administrative remedies, and failure to join the FAA as a necessary party.

*1.    Preemption*

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."

Federal preemption is treated as an affirmative defense that can be raised in a motion to dismiss under Rule 12(b)(6). *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984), *on reh'g*, 764 F.2d 1400 (11th Cir. 1985); *see, e.g., Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 914–15 (11th Cir. 2020). A "complaint may be dismissed under Rule 12(b)(6) when its own allegations

---

[16]The primary-jurisdiction doctrine applies "when a court maintains jurisdiction over a matter but nonetheless abstains for prudential reasons," "unlike when a court lacks subject-matter jurisdiction." *Sierra v. City of Hallandale Beach*, 904 F.3d 1343, 1350 (11th Cir. 2018). To the extent Boomerang argues this Court, under the doctrine, should dismiss or stay the action and direct the parties to proceed through the FAA, the argument fails because the court lacks subject-matter jurisdiction.

indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint." *Quiller*, 727 F.2d at 1069. An affirmative defense otherwise must be raised in a responsive pleading. *Bingham v. Thomas*, 654 F.3d 1171, 1175 (2011).

The party "asserting an affirmative defense usually has the burden of proving it." *In re Rawson Food Serv. Inc.*, 846 F.2d 1343,1349 (11th Cir. 1988). Because federal preemption is an affirmative defense, the defendant bears the burden of proof "and presumably the burden of persuasion, even if no additional facts must be proven and the issue is only a question of law." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010); *see also Sikkelee v. Precision Airmotive Corp.*, 907 F.3d 701, 708 (3d Cir. 2018) ("Preemption is an affirmative defense on which [the party asserting it] bears the burden of production and persuasion.").

Citing no procedural rule, Boomerang argues the preemption provision of the Airline Deregulation Act—49 U.S.C. § 41713(b)(1)—preempts the subject matter of the complaint, contending the Airport Authority is improperly attempting to "proscribe the permissible routes and services of a certificated air carrier." Doc. 6 at 12–14. The Airport Authority argues to the contrary, contending it is not trying to regulate Boomerang's routes or services, and, regardless, it is exercising the proprietary powers of an airport owner, which the Airline Deregulation Act permits. Doc. 7 at 4–5, 7.

In 1978, Congress determined that open competition in the airline industry—especially for rates and services—would benefit consumers and the economy and that deregulation could achieve this. *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 132 (3d Cir. 2018). Congress therefore enacted the Airline Deregulation Act. *Id.* To ensure states would not undo federal deregulation with regulation of their own, Congress included an express preemption provision. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378–79 (1992).

29

The express preemption provision provides: "[A] State [or a] political subdivision of a State … may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1). The provision defines the segment of the industry to be regulated ("air carrier[s] that may provide transportation under this subpart"), the type of regulation ("related to a price, route, or service"), and the form of state action prohibited ("having the force and effect of law"). *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 (4th Cir. 2018). The Supreme Court has interpreted the provision broadly, finding it preempts state laws related to advertising, fraudulent and deceptive practices, and breach of an implied covenant. *Id.* (citing *Morales*, 504 U.S. at 374; *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995); and *Northwest, Inc. v. Ginsberg*, 572 U.S. 273 (2014)). The provision "limits what most airports can do because most airports are operated by a local authority." *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 216 (D.C. Cir. 2010).

While providing express preemption, Congress also ensured airport authorities retain some control over their facilities, adding in the Airline Deregulation Act that the express preemption provision "does not limit a State [or] political subdivision of a State … that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights."[17] 49 U.S.C. § 41713(b)(3); *see also Bldg. & Constr. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass/R.I., Inc.*, 507 U.S. 218, 227 (1993) (explaining state does not regulate by merely acting within protected zone; when state owns and manages property, state must interact with private participants in marketplace; in doing so, state is not subject to preemption; preemption "doctrines

---

[17]Congress revised the preemption language in 1994 to its current form without intending to substantively change the law. *See* Pub. L. No. 103-272 § 1(a), 108 Stat. 745 (1994); *Am. Airlines, Inc*, 513 U.S. at 223 n.1.

apply only to state *regulation"*; government as regulator is distinct from government as proprietor).

Neither the Airline Deregulation Act nor its implementing regulations define "proprietary powers and rights," *Air Transp. Ass'n of Am. v. City & Cty. of San Francisco*, 992 F. Supp. 1149, 1188 (N.D. Cal. 1998), *aff'd and remanded*, 266 F.3d 1064 (9th Cir. 2001), and courts have not articulated the "precise scope" of an airport owner's proprietary power, *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 806 (5th Cir. 2000). But in defining the permissible scope of a proprietor's power to regulate, "federal courts have repeatedly held that an airport proprietor can issue only reasonable, nonarbitrary, and nondiscriminatory rules that advance the local interest." *Id.* (internal quotation marks and quoted authority omitted).

"Courts have concluded that airports are exercising their proprietary powers when they issue noise regulations, restrict access based on airport capacity, and impose perimeter rules that redirect long-haul carriers to other airports." *Air Transp.*, 992 F. Supp. at 1188 (citing cases); *see also Airline Serv. Providers Assoc. v. L.A. World Airports*, 873 F.3d 1074, 1077, 1085 (9th Cir. 2017) (Airline Deregulation Act does not preempt city operating airport from requiring airport businesses to accept contractional conditions aimed at preventing service disruptions; city may impose conditions as proprietor of airport); *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 97 (2d Cir. 1986) (finding no authority for claim that town, as airport owner, had to permit airline to serve as a fixed-base operator year-round and had to lease airline equipment necessary for year-round air services; leases are valid exercise of town's proprietary rights).

Here, Boomerang fails to satisfy its burdens of proof and persuasion that the affirmative defense of express preemption clearly appears on the face of the complaint. Boomerang fails to mention, much less address, the Airline Deregulation Act's "proprietary powers and rights" provision. Boomerang fails to explain how requiring Boomerang to execute an operating agreement and comply with minimum

operating standards before continuing operations at the airport would significantly affect Boomerang's services. And Boomerang fails to explain how the Airport Authority's requested relief constitutes a law, regulation, or other provision having the force and effect of law related to a price, route, or service. As discussed in the analysis of subject-matter jurisdiction, the Airport Authority is merely trying to establish a condition under which Boomerang may continue to operate at the airport—namely, execution of an operating agreement and compliance with minimum operating standards.

Dismissal based on the affirmative defense of express preemption is unwarranted.

## 2.   *Failure to Exhaust Administrative Remedies*

The failure to exhaust nonjudicial remedies is regarded as an affirmative defense, *Jones v. Bock*, 549 U.S. 199, 212 (2007), and, like a motion to dismiss based on preemption, a motion to dismiss for failure to exhaust administrative remedies is treated as a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted, *Mitchell v. Farcass*, 112 F.3d 1483, 1485 (11th Cir. 1997).[18]

Citing 14 C.F.R. § 16.247—the provision allowing a person to seek judicial review of a final FAA decision under Part 16—Boomerang contends dismissal is warranted because the Airport Authority failed to exhaust Part 16 administrative remedies. Doc. 6 at 15. Citing *Arapahoe*, where the FAA ultimately reached the opposite conclusion of the state supreme court, Boomerang contends the need for

---

[18]If exhaustion is treated as a "matter in abatement" and not an "adjudication on the merits," the judge may consider facts outside the pleadings and "resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." *Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008).

Here, Boomerang does not ask the Court to consider extrinsic evidence or resolve any factual dispute.

exhaustion "is plain."[19] Doc. 6 at 15. The Airport Authority responds it is not seeking to adjudicate whether it is in compliance with obligations under federal law, including FAA regulations, and, in any event, the Part 16 administrative remedies are inapplicable because they apply where a petitioner files a complaint against an airport. Doc. 7 at 8.

Neither side addresses whether exhaustion of Part 16 administrative remedies is a jurisdictional requirement or whether exhaustion of Part 16 administrative remedies must be pleaded in a complaint. *See generally* Doc. 6 at 15; Doc. 7 at 8. Regardless, Boomerang's argument fails. The provision Boomerang cites pertains to review by a court of appeals of an FAA final decision on a complaint by a petitioner. *See* 14 C.F.R. § 16.247. As the Airport Authority observes, Part 16's administrative procedures address complaints against an airport operator, not by an airport operator. *See generally* 14 C.F.R. §§ 16.1, 16.23; *see also* Doc. 6-4 at 83 ("14 CFR Part 16 contains the agency procedures for filing, investigating, and adjudicating formal complaints against airport operators.").

Dismissal based on the affirmative defense of failure to exhaust administrative remedies is unwarranted.

3.    *Failure to Join a Necessary Party*

Rule 12(b)(7) provides that a complaint may be dismissed for failure to join a party under Rule 19.

"Rule 19 provides the rules for mandatory joinder of parties." *Mollinos Valle Del Cibao, C por A. v. Lama*, 633 F.3d 1330, 1344 (11th Cir. 2011). Under Rule 19(a),

---

[19]Without elaboration, Boomerang states that if the Airport Authority had a good faith belief that Boomerang's operations constituted an imminent threat to the public health, safety, and welfare, the Airport Authority would be obligated to file a complaint under 14 C.F.R. Part 13. Doc. 6 at 15. The Court need not address this statement. Boomerang neither cites authority nor provides analysis on exhaustion under Part 13.

a "person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party" if, "in that person's absence, the court cannot accord complete relief among existing parties," or if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence" may "as a practical matter impair or impede the person's ability to protect the interest" or may "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1).

"Inconsistent obligations are not the same as inconsistent adjudications or results. Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1040 (11th Cir. 2014). "Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum." *Id.*

If a party meets the description in Rule 19(a) and cannot be made a party, the court must determine under Rule 19(b) whether that party is "indispensable," *Provident Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118–19 (1968)—that is, whether "in equity and good conscience," the action "should proceed among the existing parties or should be dismissed," considering the "extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties," the extent to which "any prejudice could be lessened or avoided," whether a "judgment rendered in the person's absence would be adequate," and whether the plaintiff "would have an adequate remedy if the action were dismissed for nonjoinder," Fed. R. Civ. P. 19(b).

"Rule 19 is a two-step inquiry." *Mollinos*, 633 F.3d at 1344. "The term 'indispensable' is not an *a priori* classification. Rather, a court determines whether a party is 'indispensable' by applying Rule 19(b)." *Kaloe Shipping Co. v. Goltens Serv.*

*Co.*, 315 F. App'x 877, 881 (11th Cir. 2009) (internal footnote omitted). "[I]t is not enough to dismiss a lawsuit merely because a party is a required (or necessary) party; the absent party must also be found, after an examination of the Rule 19(b) factors, to be indispensable to the pending litigation." *Santiago v. Honeywell Int'l, Inc.*, 768 F. App'x 1000, 1005 (11th Cir. 2019). Where a district court fails to examine the Rule 19(b) factors, vacatur and remand is warranted. *Id.* at 1004–07. But if a party does not meet the Rule 19(a) criteria, a court need not consider the Rule 19(b) factors. *See Winn-Dixie Stores*, 746 F.3d at 1040.

Boomerang argues the Court should dismiss the complaint because the Airport Authority failed to join the FAA as a necessary party. Doc. 6 at 16–19. Citing Rule 19(a), Boomerang contends that, in the FAA's absence, the existing parties risk inconsistent obligations. Doc. 6 at 16. Referencing *Arapahoe*, Boomerang contends, "In upholding the FAA's final [o]rder suspending the [airport authority's] federal funding, the [court of appeals] noted that the FAA had not been made a party to the underlying proceedings, and found this precluded any preclusive effect of the prior judicial proceedings." Doc. 6 at 17.

The Airport Authority responds the Court can provide complete relief without the possibility of inconsistent obligations because it is "merely seeking to enforce its minimum operating standards by requiring Boomerang to execute an operating agreement." Doc. 7 at 10. The Airport Authority explains it has not banned service, there is no action pending before the FAA, there is no question of the Airport Authority's compliance with grant assurances, and even if the FAA is a necessary party, it can simply be joined. Doc. 7 at 10.

 Boomerang's argument fails. Contrary to its contention, the existing parties do not risk inconsistent obligations. If the Court entered a judgment declaring that Boomerang must execute an operating agreement to continue flying on-demand and scheduled services or enjoined Boomerang from continuing to fly on-demand and scheduled services absent an executed operating agreement, the action here ends.

Boomerang could decide to file a Part 16 complaint against the Airport Authority. At any such proceeding, the issue would be not whether Boomerang must execute an operating agreement to continue flying on-demand and scheduled services but whether the Airport Authority violated its grant assurance of nondiscrimination and the consequences of the violation, up to the loss of grant money. The court of appeals in *Arapahoe* found that preclusion was inapplicable in part because the FAA had not been a party to the state-court proceedings, not that the FAA was a necessary or indispensable party to the state-court proceedings.

Even if the FAA was a necessary party under Rule 19(a), Boomerang does not contend the complaint should be dismissed because the FAA cannot be joined and is indispensable, failing to even discuss the Rule 19(b) factors.

Dismissal based on failure to join a necessary party is unwarranted.

## IV.   Recommendation[20]

The undersigned recommends:

(1)   **granting in part** the Airport Authority's motion to rule on subject-matter jurisdiction and the motion to dismiss, Doc. 33,

---

[20]If the recommendation is not adopted, the undersigned recommends **denying** the motion to dismiss, Doc. 6, and **directing** the parties to provide a case management report within 14 days of any order denying the motion to dismiss.

"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

and ruling on subject-matter jurisdiction but not the motion to dismiss;

(2)     **remanding** the case to state court for lack of subject-matter jurisdiction; and

(3)     **directing** the clerk of court to close the file.

**Entered** in Jacksonville, Florida, on June 9, 2020.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      The Honorable Marcia Morales Howard
        Counsel of record